# EXHIBIT 1

```
                      UNITED STATES DISTRICT COURT
                        DISTRICT OF NEW JERSEY

UNITED STATES OF AMERICA,          .
                                   .
         Plaintiff,                .
                                   . Case No. 21-mj-12036
vs.                                .
                                   . Newark, New Jersey
MOHUMMAD SIMMONS,                  . February 3, 2021
                                   .
         Defendant.                .
                                   .


                      TRANSCRIPT OF BAIL HEARING
                 BEFORE THE HONORABLE EDWARD S. KIEL
                   UNITED STATES MAGISTRATE JUDGE


APPEARANCES (the parties appeared via Zoom videoconference):

 For the Government:      DESIREE GRACE LATZER, ESQ.
                          Office of the U.S. Attorney
                          District of New Jersey
                          970 Broad Street, 4th Floor
                          Newark, NJ 07102
                          (973) 645-2708
                          desiree.latzer@usdoj.gov


 For the Defendant:       RAHUL SHARMA, ESQ.
                          Office of the Federal Public Defender
                          1002 Broad Street
                          Newark, NJ 07102




Audio Operator:

Transcription Service:    KING TRANSCRIPTION SERVICES
                          3 South Corporate Drive, Suite 203
                          Riverdale, NJ  07457
                          (973) 237-6080


Proceedings recorded by electronic sound recording; transcript
produced by transcription service.
```

1                          <u>I N D E X</u>

2

3    <u>Proceeding</u>                                        <u>Page</u>

4        Proceedings                                      3

5        The Court's Ruling                              23

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (Commencement of proceedings)

2

3             THE COURT:  We're on the record in the matter of

4  United States of America versus Mohummad Simmons.  It's Case

5  Number 20-12036 [sic].

6             If we could have appearance on behalf of the

7  Government, please.

8             MS. LATZER:  Good afternoon, Judge.  Desiree Grace

9  Latzer, Assistant United States Attorney, for the Government.

10            THE COURT:  Okay.

11            And on behalf of the defendant.

12            MR. SHARMA:  Good afternoon, Your Honor.  Rahul

13  Sharma on behalf of Mr. Simmons.

14            THE COURT:  Okay.

15            Mr. Simmons, you can hear and see me?

16            Just nod your head if you can.

17            Okay.  If any time you cannot hear or see me,

18  please raise your hand or give us a signal, because I want to

19  make sure you can hear and see everything that's going on

20  today.

21            Okay?

22            Okay.  Do you also consent to this proceeding being

23  conducted by video conference today?

24            Just nod your head "yes," sir.

25            Okay.  Why don't you take yourself off of mute?

1    Looked like you didn't quite hear me.

2              MR. SHARMA:  It's quite loud over there,

3    Your Honor.

4              THE COURT:  I know.

5              All right.  There -- because there should be a

6    button for you to push to unmute yourself, sir.

7              THE COURT OFFICER:  Mr. Simmons, there should be a

8    button to unmute yourself on the screen.

9              THE COURT:  Okay.  Very good.

10             THE DEFENDANT:  Can you hear me?

11             THE COURT:  Mr. Simmons, when I asked you, whether

12   consented to --

13             THE DEFENDANT:  You can hear me?

14             THE COURT:  -- by video conference, I didn't get an

15   answer from you.

16             Do you consent?

17             THE DEFENDANT:  Yes.

18             THE COURT:  Okay.  Very good.

19             All right.  I'm going to review -- and if you want

20   to speak to Mr. Sharma at some point --

21             All right.  Anthony, if you could put him on mute

22   as well.

23             Thank you.

24             All right.  We're here for a bail application.  And

25   I understand that at the initial appearance last week or a

1   couple of weeks ago, that Mr. Simmons consented to detention

2   without prejudice to making a bail application.  The bail

3   application has been made.

4            It's my understanding that defendant is proposing

5   that Ms. Tatiana Lee [phonetic] be a third-party custodian.

6   He'd be released to his custody -- to her custody.  Pretrial

7   Services has deemed her an appropriate candidate to serve as

8   a third-party custodian.  And I presume everybody has

9   received the updated report from Pretrial Services.

10           So Pretrial Services has made their recommendation.

11           So I'll guess I'll hear first from the Government.

12           Ms. Latzer?

13           MS. LATZER:  Thank you, Judge.  I mean, just

14   reserving the right to respond after Mr. Sharma makes his

15   arguments, since it's his motion.

16           The Government's seeking detention here --

17           THE COURT:  All right.  I should ask Mr. Sharma

18   that.  That is true, and I --

19           But go ahead, since you have the floor.

20           MS. LATZER:  Thank you, Judge.

21           The Government's seeking detention here for a

22   number of reasons, probably the most telling of which is that

23   Mr. Simmons was arrested on some of the burglaries or one of

24   the burglaries that pertain to this conspiracy and was

25   released on conditions in the state court.  He then continued

1   to commit a slew of additional pharmacy burglaries, this

2   exact same conduct for which he had already been arrested

3   while under conditions of a state court.

4           He was also placed on home detention from that

5   state court judge.  And that when we went to arrest him for

6   this federal warrant, he was hanging out on a street corner

7   in Jersey City with other known felons that at least the

8   Government is well familiar with and ignoring all of the

9   conditions that he had previously been placed on.

10           And that really is just the most recent example of

11   a 10-year uninterrupted slew of Mr. Simmons ignoring

12   court-ordered conditions.  I don't typically place a lot of

13   emphasis on juvenile conduct, but because of the fact that it

14   really was the beginning of an impressive -- an impressive

15   stretch of ignoring court orders, I'll just outline it

16   briefly.

17           Starting in 2010, when he was 14 years old, he was

18   arrested in -- I'm sorry -- he was sentenced in February of

19   2010 for two different arrests, one of which obviously

20   occurred while he was on pretrial release, and he was

21   sentenced to one-year probation at that time.

22           Two months into his probationary term, he was

23   arrested with a gun.  Three months after that, while now on

24   probation and pretrial release, he was arrested again.  In

25   September 2010, he was sentenced to two years' probation for

1    those two arrests.  And nine months into that probationary

2    period, he's arrested with controlled dangerous substances.

3    Two months after that, again, on probation and pretrial

4    release, he's arrested with another gun.

5            And his adult conduct is exactly the same.

6    Starting in September 2013, he's arrested for distribution of

7    controlled substances.  A couple of months later while on

8    pretrial release, he's arrested distributing narcotics.  Six

9    months after that, again on pretrial release, now for two

10   pending causes, he's arrested distributing narcotics.  That

11   resulted in a bench warrant.  For those three offenses, he

12   pled guilty in October of 2014 to distribution of narcotics

13   on two of them and possession on one.  And he was placed on a

14   two-year probationary period.

15           During that probationary period, he accumulated

16   one, two, three, four -- four different arrests, I believe,

17   all of which had to do with controlled substances, the

18   distribution of controlled substances.

19           Eventually, this results in a violation of

20   probation, a violation of probation, held without bail with

21   new charges.  His probation ultimately is revoked, obviously,

22   because he couldn't comply.  And he's finally sentenced to

23   five years' confinement in July of 2017.

24           That is the only period of time in his entire life,

25   since he was 14 years old that he refrained from getting

1    arrested.

2           After he was released from that term of

3    imprisonment, he almost immediately resumed his criminal

4    career, again, with controlled dangerous substances.  He's

5    arrested in November of 2020 on one of the pharmacy

6    burglaries that pertain to this conspiracy.

7           And I should also note for Your Honor, that this

8    conspiracy is obviously expansive.  The Court knows that from

9    the complaint.  But Mr. Simmons is a leader of this

10   conspiracy.

11          So he's arrested.  He is placed on conditions from

12   a state court judge, which, honestly, is surprising to me, at

13   least looking at his record, given that he's demonstrated an

14   inability to comply with anything.  But he is released, and

15   he's given an opportunity to comply.  And, again, he fails to

16   do that.  So he has committed additional crimes in addition

17   to ignoring the terms.

18          I would note for Your Honor that that was in

19   November.  He was incarcerated for a short period of time

20   while that was -- what's the -- while that was pending.  So

21   he's arrested for a new pharmacy burglary on December 7th.

22   And he's -- pretrial was denied on December 18th.  Let's see.

23   I think he was actually released -- sorry.  He was released

24   on December 18th.  And one of the conditions there,

25   Your Honor, that he be on home detention.

1           And the next day, on Saturday, December 19th, he

2    went to Virginia.  So he's on December 18th released from

3    custody, on home detention in Jersey City, not permitted to

4    leave, and the next day he goes to Virginia.

5           December 20th, he's in Atlanta, Georgia.  And he

6    comes back then on December -- at some point between

7    December 20th and December 23rd, he comes back, because on

8    December 23rd, he actually goes to the -- I believe it was

9    the Secaucus Police Department to recover his personal

10   property.  And later that day, he's actually observed with --

11   I believe it was Rico Phang -- or -- I'm sorry -- Deon Davis.

12   He's observed with Deon Davis on December 23rd.  And one of

13   the -- another condition of his pretrial release is is that

14   he not have any contact with his co-defendants Rico Phang and

15   Deon Davis, so he literally goes to the Secaucus police

16   station and leaves with his co-defendant that he's not

17   allowed to have any contact with.

18          So whether the conditions are serious, like don't

19   commit another state or federal crime, or whether they're

20   routine -- stay on home detention where you're confined to or

21   don't have contact with your co-defendants -- he literally

22   cannot comply with any of them.  And it's for those reasons,

23   that the Government believes that he is a danger to the

24   community and a flight risk.  There is a bench warrant in his

25   past, but there's really no reason at all to think that he

1   will comply with any conditions that this Court sets.

2           And lastly, Your Honor, I would just note that it's

3   my understanding that the -- the counties in which he has

4   pending cases, that they do intend to revoke his release in

5   the event that he's released on our case, because they too

6   share the concern that he will reoffend.

7           THE COURT:  All right.  Very good.  Thank you very

8   much.

9           Mr. Sharma.

10          MR. SHARMA:  Okay.  First, Your Honor, just to

11  start with, what the prosecutor just said that the counties

12  intend to revoke his pretrial release, no, the prosecutors

13  intend to request revocation of his pretrial release.  The

14  counties have not made that decision yet.  And, in fact, when

15  the prosecutor --

16          MS. LATZER:  Okay.  I apologize for that.  I didn't

17  intend to represent that I knew what the courts will do.

18          The prosecutors do intend to seek revocation.

19          MR. SHARMA:  And when the prosecutors sought

20  revocation on December 18th, in Secaucus, the court denied

21  that petition.

22          Now, since December 18th, Your Honor, he has -- so

23  I did not know about these -- I did not know about these

24  trips, apparently to Atlanta.  I don't know what -- I don't

25  have that information in front of me.  Apparently the

1   prosecutor has this information.  I don't have it.  So I

2   can't respond to that.

3          But what I can say is this.  We are willing to, of

4   course, concede that Mr. Simmons has not -- has not behaved

5   properly on pretrial release in the past.  And that is

6   exactly why he is -- we are willing to agree to the most

7   stringent restrictions on him, including location monitoring

8   and home incarceration.  We have Tatiana Lee as a bond

9   co-signer and as a third-party custodian.

10         Now, I think that we could also -- since he has

11  had -- apparently had contact with certain defendants in the

12  case, we could also impose a condition of no phone usage

13  whatsoever by him.  And we could even require Ms. Lee to

14  submit phone records, if necessary, to the Court to show

15  that -- to show that the only phone calls made from her

16  residence are when she is there and they are her phone calls.

17         Every single bit of Mr. Simmons' illegal activity

18  while out on pretrial release has been outside the home.

19  There is no allegation that he has maintained a residence to

20  commit any crimes.  There is no allegations that he's ever

21  distributed drugs from a residence.  There's no allegation --

22  the prosecutor mentioned a couple of times gun charges.

23  Those are from 20- -- the last time he faced a gun charge was

24  2013.  In the last eight years, he has never faced a gun

25  charge.

1          The instant offense is for burglaries.  And the

2     burglaries at issue here did not involve a weapon.  And this

3     is not a presumption case, Your Honor.  Okay?  So given that

4     it's not a presumption case, the Government, to find that he

5     is a danger to the community, they're -- the Court must find

6     that by clear and convincing evidence, by clear and

7     convincing evidence, there is no combination of conditions

8     that can reasonably assure the Court that -- I'm sorry?

9          THE COURT:  Let me just throw something out at you.

10          I understand that these are burglaries and there

11     wasn't violence or guns or anything involved.

12          But the problem with burglaries is that they can

13     lead into very unfortunate circumstances.  When you break

14     into somebody's business or you break into somebody's

15     residence, that that comes with it a very inherent danger of

16     a very troubling situation that could happen.  Right?

17          MR. SHARMA:  Certainly, Your Honor.  And so, look,

18     I think the Government pretty much says that their primary

19     concern is danger to the community.  His last bench warrant

20     was 2015.  Since then he has had no bench warrant; so in the

21     last six years.

22          I understand the Government reserves its right to

23     argue risk of flight, but I think their primary concern is

24     pretty clearly danger to the community.

25          Under home incarceration with location monitoring,

1   this Court can impose basically a "one strike and you're out'

2   rule in this case.  And this is exactly the kind of person

3   who home incarceration was -- who home incarceration is

4   perfect for, because --

5         THE COURT:  He was already on home incarceration

6   under the state -- under the state charges back in December

7   of 2020.  As I understand it, when his pretrial detention was

8   denied, he was released on Level 3 and my report indicates

9   that that was 24-hour home confinement.  And what I have from

10  the complaint is that -- or what I have a proffer from the

11  Government is that he doesn't care whether that's a condition

12  in any event.  I mean, how am I supposed to be confident in a

13  person that gets the most -- most stringent and most

14  restrictive conditions from a state court and flaunts it and

15  doesn't care whether he violates that?  How am I going to be

16  assured that placing a bracelet on him is going to change

17  anything?

18        MR. SHARMA:  Because I do think that changes

19  things, Your Honor.  He will be on a bracelet, and so he will

20  know that one strike and he's out.

21        And I do want to say that there's no allegation

22  that he's ever done any criminal activity from home.  He will

23  be confined to the house 24/7 on a location monitoring

24  bracelet.  He goes outside the front door, he is out.  You

25  will not hear me at a follow-up hearing.  If that happens,

1   which I don't expect it to because I think he understands

2   that this is now the feds, this will be a bracelet, he will

3   be monitored.  He will basically have a GPS bracelet on him

4   that will be able to detect as soon as he leaves the house.

5   I -- there will be no argument from us, absolutely none

6   that -- for keeping him out if he leaves the front door

7   without permission.  And as soon as that happens, Officer

8   Austin [phonetic] can file a violation petition.

9          And I just want to reiterate that there's no

10  allegation of him ever committing a crime inside the home.

11  There's no allegation of him conducting any sort of criminal

12  activity inside the home.  And under United States v. Himler,

13  Your Honor, 797 F.2d 156, pincite 160, the Third Circuit said

14  that a danger to the community determination can only be

15  based on a finding that the defendant will commit one or more

16  of the crimes actually specified by the bail statute.  So

17  while burglary is absolutely a serious crime, Your Honor, and

18  we don't deny that and that will be dealt with at sentencing

19  in this case, it is not a crime specified by the bail

20  statute.  It is not a presumption offense.  And, therefore,

21  it is not the risk of him committing burglaries or the fact

22  that he did commit burglaries is not a valid basis for

23  finding him to be danger to the community.

24          Now, if the Court found that he -- that there is --

25  that there's no combination of conditions that can reasonably

1   assure that Mr. Simmons will not deal narcotics from home,

2   that would be another -- that would be a crime specified by

3   the bail statute.

4          But notably, in Mr. Simmons' entire career, I do

5   not know of any single instance where he is alleged to have

6   dealt drugs from his home, where his home has ever been a

7   home base for any criminal activity.  Therefore, since he is

8   not a risk of flight and the danger to the community

9   determination -- the danger to the community of him

10  committing a burglary can only be -- can only be used in

11  setting conditions of release, it cannot be a basis for

12  detaining him under Himler, Your Honor.

13         And as this Court reiterated in 2016, a decision by

14  Judge Linares, United States v. Akinola where Judge Linares

15  said, having reviewed Himler, the Court agrees with the

16  defendant that only the crimes identified in § 3142 of the

17  Bail Reform Act would support a finding by the Court that the

18  defendant poses a danger to the community.

19         THE COURT:  Okay.  So that you're saying that under

20  the case law, that an order to detain him, that there has to

21  be a finding that he is a person that would commit one of the

22  crimes that's listed under the rebuttal presumption provision

23  of the statute.  Right?

24         MR. SHARMA:  Correct, Your Honor.

25         THE COURT:  Is that what you're saying?

16

1              Okay.

2              All right.  Anything further?

3              MR. SHARMA:  Your Honor, I respectfully ask the

4    Court to -- if it so pleases, Tatiana Lee is on the phone on

5    her mother's phone and to hear from Ms. Lee about her

6    willingness to co-sign the bond and to serve as a third-party

7    custodian, not to, you know, tug the Court's heart strings or

8    anything, but to show the Court that Mr. Simmons, he

9    understands at this point, he's in federal court.  He's not

10   in state court.  He would have a bracelet on.  And that it

11   would be a "one strike you're out" policy, and that if -- and

12   that he would be putting his entire family in jeopardy if

13   that were to happen, especially because his wife needs to

14   work.

15             So I respectfully believe that the fact that

16   Ms. Lee works outside the home and requires child care from

17   Mr. Simmons would -- is a further reason to think that he

18   will not violate if he is braced on a bracelet and if there

19   is $100,000 bond and a third-party custodian and any other

20   restrictive conditions that the Court believes are necessary.

21             THE COURT:  I'll hear from her after I hear from

22   Ms. Latzer again.

23             I'm just -- you know, it -- it is amazing with the

24   technology, the things that you can do, and I appreciate you

25   giving me the pincite.

1          I'm looking at the <u>Himler</u> case, a Third Circuit

2    1986 case.  And the beginning of it begins, "In this appeal

3    from a detention order entered by the district court, we must

4    consider whether, under the Bail Reform Act of 1984, an

5    accused taken into custody may be detained prior to trial

6    based on danger to the community where the detention hearing

7    was justified only by an alleged serious risk of flight."

8          And I haven't had a chance to review the rest of

9    the case, but that seems to be slightly different than what

10   you're saying.

11         But let me hear from Ms. Latzer.

12         MR. SHARMA:  But at the pincite of 160, Your Honor,

13   the court says a danger to the community finding can only be

14   based on a finding that the defendant will commit one or more

15   of the crimes actually specified by the bail statute.  If

16   Your Honor does "control-F" for the phrase "actually

17   specified by," you will find that quote.

18         MS. LATZER:  Judge, I think I can, like, negate

19   this entire academic exercise, because there's more than

20   ample evidence in this investigation that Mr. Simmons wasn't

21   stealing these controlled substances for the fun of it.  They

22   were dealing the promethazine with codeine in the streets of

23   Jersey City through one primary, currently uncharged

24   co-conspirator.  And if Mr. Simmons would prefer that he also

25   be charged at this juncture with a possession with intent to

1   distribute those controlled substances, there's more than

2   probable cause to support that, and we could swear out an

3   amended complaint today.

4          And at that point, it would be a presumption of

5   detention case.  But I can just proffer for the Court that

6   the investigation has revealed that evidence, that they were

7   distributing these narcotics.  And it's the fact that

8   Mr. Simmons has never once complied with a condition of

9   release that gives everyone concern that, if given any

10  opportunity, any leeway, he's going to reoffend or be a

11  flight risk.

12         And the flight risk is also part of the Court's

13  analysis, because his history demonstrates an inability to

14  comply, whether those conditions are stay at home, don't

15  communicate with your co-defendants, show up to court, these

16  are all things that we have concerns about.

17         And I would also note for Your Honor that the state

18  court judge who denied the request that the prosecutors

19  request that his bail be revoked in December, I'm sure

20  thought at that point that he would take the judge 's warning

21  quite seriously.  But I would note for Your Honor that the

22  vehicle that Mr. Simmons was arrested in on this charge was

23  used in two more pharmacy burglaries Hoboken, New Jersey,

24  days earlier.  So he's -- he didn't even listen in December

25  of 2020 when he was told to stop committing additional

1    crimes.

2           And this reference to some sort of, like, one

3    strike and you're back, I'm not aware of where that is in the

4    Bail Reform Act because there's absolutely no requirement or

5    practical justification that a court would allow someone an

6    opportunity to commit a new crime before we apply the Bail

7    Reform Act which directs the courts to protect the community.

8           For those reasons and basically -- I really can't

9    emphasize enough, Your Honor, that he's been given at last 10

10   different directives from judges in his 10 -- the last 10

11   years of his life to comply with conditions, including don't

12   commit new offenses, and has not been able to do that once.

13   The Government would ask the Court to keep him detained.

14           THE COURT:  Okay.  Very good.

15           Well, go ahead, Mr. Sharma.

16           MR. SHARMA:  Thank you, Your Honor.

17           I just want to say very briefly that the operative

18   term in what the AUSA just said is in the streets of Jersey

19   City.  And so whatever illegal conduct Mr. Simmons is accused

20   of occurs outside the home.  And so that is exactly why he

21   would be under home incarceration.

22           As for the idea of one strike and you're out being

23   a ridiculous concept under the Bail Reform Act, I am not

24   saying that he be given the opportunity to commit another

25   crime.  The -- under § 3148 of the Bail Reform Act, the court

 1    can revoke an order of release on a finding that -- not

 2    simply on a find that the person poses a risk of flight or a

 3    danger to the community, but on a -- but also on just a

 4    finding that the person will not follow the condition of

 5    release.

 6             And so what I'm saying is that under 3148 that the

 7    Court could very easily revoke as soon as there was any

 8    indication, which I don't expect there to be in this case,

 9    just as I did not expect in Moses Martinez's case and other

10    cases where clients of mine have gotten home incarceration,

11    because they understand that it's federal.  They're on a

12    location monitoring bracelet, and there's concern -- there's

13    absolutely a valid concern about him not following the rules,

14    but I believe that conditions of release can reasonably

15    assure the Court -- not guaranteed, because nothing can

16    guarantee, and that's not the standard under the Bail Reform

17    Act -- can reasonably assure the Court home incarceration,

18    strict home incarceration with location monitoring, a bond,

19    and third-party custodian can reasonably assure the Court

20    that the -- that Mr. Simmons will appear for all of his --

21    will appear for all of his court appearances and will not

22    pose a danger to the community.

23             As for the -- as for the Government's threat of

24    bringing a charge under 21 U.S.C. for dealing promethazine

25    with codeine, dealing promethazine with codeine, that is a

1   Schedule V drug, Your Honor, and so dealing promethazine with

2   codeine would carry no more -- would carry a maximum sentence

3   of one year in prison, and so therefore it would not be a

4   presumption offense.

5           Once again --

6           THE COURT:  --

7           MR. SHARMA:  -- Your Honor.

8           THE COURT:  Go ahead.  I'm sorry.

9           MR. SHARMA:  I just want to reiterate we are not

10  asking for -- we are not asking for him to be allowed back

11  out on streets.  And he understands that this is far more

12  serious than it ever was in Essex County.  And that is -- and

13  I understand the Court's unwillingness to say, well, why

14  should Pretrial Services babysit him, or why should this be

15  any sort of -- why should he get any sort of break here when

16  he has been so bad on state pretrial release?  I respectfully

17  believe that that is because the standard is whether

18  conditions of release, a combination of conditions of release

19  can reasonably assure the safety of the community and his

20  appearance in court.  And I believe that home incarceration

21  with location monitoring and a bond and a third-party

22  custodian and, if necessary, a strict court order of no use

23  of the phones while -- like unless Tatiana Lee is present and

24  not with the defendant, I think that is absolutely

25  appropriate here.  But those conditions go to the

1    restrictiveness of the conditions, not the absence of any

2    combination that can reasonably assure those things.

3                THE COURT:  All right.  Well, I appreciate your

4    citation.  If you heard the printer going behind me, I

5    printed out the case, and I'll be sure to make sure that I'll

6    read it.  And I will do that.

7                All right.  So thank you for the good arguments of

8    counsel.  I appreciate it.

9                Mr. Sharma, I don't think it's necessary for

10   Ms. Lee to make a statement, but if you want to give her the

11   opportunity, I'm open to it.  Do you want to still have her

12   make a statement?

13               MR. SHARMA:  Yes, Your Honor, if possible.

14               THE COURT:  Okay.

15               Ms. Lee, you can take yourself off mute, put

16   yourself on video, and I'll hear from you.

17               Ms. Lee, are you there?

18               MR. SHARMA:  Ms. Lee, have we lost you?

19               THE COURT:  She's there.

20               Ms. Lee, there's a button in front of you that pops

21   up that says -- asking you to unmute yourself?

22               MR. SHARMA:  She might be busy with the kids,

23   Your Honor.

24               THE COURT:  All right.  Very good.  All right.

25               MR. SHARMA:  And it's fine.  I don't want to -- oh,

1   she's at work.  Okay.

2              THE COURT:  We're running a little behind as well.

3              MR. SHARMA:  Okay.

4              THE COURT:  But that's not a reason not to give her

5   an opportunity.  All right.

6              MR. SHARMA:  I appreciate it, Your Honor, but she's

7   not available, so we'll just --

8              THE COURT:  Very good.

9              Well, as I said, I've heard the argument of

10  counsel.  I've seen the recommendation.  I spoke to Pretrial

11  Services.  And at this point, I think -- well, I conclude

12  that the Government has shown by at least preponderance of

13  the evidence that no condition or combination of conditions

14  will reasonably assure the defendant's appearance, as

15  required.  The Government went through a long litany of -- a

16  very long criminal history of the defendant.  I took that

17  into consideration.  The weight of the evidence against the

18  defendant is strong.  I've read the complaint.  It looks like

19  he was on video -- videotape on many of the incidents that

20  happened.  He has a very long criminal history.

21             And of particular importance to me was his

22  participation in criminal activity while on probation,

23  parole, and supervision.  And I don't need to go through the

24  entire litany again.  That was summarized by Ms. Latzer.  It

25  is extensive.  It is nonstop from the time that he's at a

1    very young age of 14 years old.  And the only time that he

2    has stopped his criminal activity and actually been in

3    compliance with what's required is when he was incarcerated,

4    starting in 2017 and a sentence of five years.

5             I do note that he is on Level 3 release from the

6    state on the charge in December 7, 2020, where he was with --

7    supposed to be on 24-hour home confinement.  I heard a

8    proffer from the Government that he did not comply with that,

9    and the next day he went to Virginia and thereafter was in

10   Atlanta.

11            But I do note that there is a report that he has

12   violated the monitoring and so scheduled to be heard, it

13   says, on January 28, 2021.  I am not sure whether that went

14   forward.

15            Ms. Austin, I presume that that was adjourned and

16   it's on for a new date in.

17            THE PRETRIAL SERVICES OFFICER:  Correct, Judge.  It

18   was adjourned, and it has no date at this time.

19            THE COURT:  Okay.

20            THE PRETRIAL SERVICES OFFICER:  I don't know why.

21   But I -- that is what they told me.

22            THE COURT:  Well, I hear the state court is

23   probably booked up like we are.

24            And very much appreciate Mr. Sharma advising, I

25   guess, his client through his oral argument the seriousness

1   of the charges.

2           But I don't think that he being in federal court is

3   going to have any effect on his continued compliance with

4   Pretrial Services supervision now that he's in federal court.

5   I have no confidence that that's going to happen.  I believe

6   that the Government has shown by a preponderance of the

7   evidence, therefore, that no condition or combination of

8   conditions of release will reasonably assure the defendant's

9   appearance, as required.

10          And I was interested in Mr. Sharma's argument about

11  the Himler case -- Himler, I think you said it was -- and I

12  was looking at it during the time that he was arguing.  But

13  to the extent that the secondary issue of the safety of the

14  community comes into play, I do find by clear and convincing

15  evidence is that there's no condition or combination of

16  conditions of release that will reasonably assure the

17  defendant -- or the safety of the persons in the community.

18  The list of -- the list of offenses in the criminal complaint

19  are lengthy.  They are -- they happen one after the other.

20  And I did have a conversation with Mr. Sharma about the

21  inherent danger in burglary that could lead to very

22  unfortunate circumstances.  And I will take a look at the

23  Himler case, and I'll be prepared to discuss it further with

24  you, Mr. Sharma, on the next conference that we have.

25          But I find that both -- both reasons warrant Mr. --

1    or the defendant's continued detention.

2            So I will continue to remand him with the United

3    States Marshal Service.

4            Okay.

5            Ms. Latzer, anything further?

6            MS. LATZER:  No, Judge.  Thank you.

7            THE COURT:  Mr. Sharma?

8            MR. SHARMA:  No, Your Honor.  Thank you.

9            THE COURT:  Okay.  We're off.  Thank you.

10                   (Conclusion of proceedings)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              Certification

2        I, SARA L. KERN, Transcriptionist, do hereby certify

3   that the 27 pages contained herein constitute a full, true,

4   and accurate transcript from the official electronic

5   recording of the proceedings had in the above-entitled

6   matter; that research was performed on the spelling of proper

7   names and utilizing the information provided, but that in

8   many cases the spellings were educated guesses; that the

9   transcript was prepared by me or under my direction and was

10  done to the best of my skill and ability.

11       I further certify that I am in no way related to any of

12  the parties hereto nor am I in any way interested in the

13  outcome hereof.

14

15

16

17

18   S/ *Sara L. Kern*                     12th of March, 2021

19   _____    _____
     Signature of Approved Transcriber            Date

20

21
     Sara L. Kern, CET**D-338
22   King Transcription Services
     3 South Corporate Drive, Suite 203
23   Riverdale, NJ  07457
     (973) 237-6080
24

25